(No. 57208.—

GERALD KLOSS, Appellee, v. THE BOARD OF FIRE
AND POLICE COMMISSIONERS OF THE
VILLAGE OF MUNDELEIN *et al.*, Appellants.

*Opinion filed May 18, 1983.*

Charles F. Marino, of Rosing, Magee & Applehans, Ltd., of Waukegan, for appellants.

Robert W. Brown, Jr., of Dunlap & Brown, Ltd., of Libertyville, for appellee.

JUSTICE UNDERWOOD delivered the opinion of the court:

Plaintiff, Gerard Kloss, was discharged by the defendant board of fire and police commissioners from his position as a Mundelein police officer on the basis of charges filed by defendant Arthur Glitz, chief of police

for the village of Mundelein. On administrative review, the circuit court of Lake County reversed the board's findings and ordered plaintiff reinstated with back pay. Defendants appealed, and our appellate court, in a divided opinion, remanded the cause for imposition of a sanction less severe than discharge. (108 Ill. App. 3d 8.) We granted defendants' petition for leave to appeal. 87 Ill. 2d R. 315.

Plaintiff's discharge stemmed from an incident which occurred at his apartment building on the evening of October 9, 1978. Although the record does not permit a detailed reconstruction of the events, the following facts were presented in testimony before the board. Officer Raymond Newman, a neighbor and co-worker of plaintiff, heard a disturbance in the corridor of the apartment building and found plaintiff's fiancee, Debbie Guthrie, in a hysterical state. She told Officer Newman that plaintiff, who was still within his apartment, was threatening to commit suicide. After she had partially regained her composure, Miss Guthrie and Officer Newman went to plaintiff's apartment, but when they tried to enter, plaintiff slammed the door shut, shouting that he wanted to be left alone. Miss Guthrie returned to Officer Newman's apartment while Officer Newman continued to attempt to speak with plaintiff. Plaintiff entered the corridor and Officer Newman observed that he "was not acting himself." Although he was shouting when he entered the hallway, plaintiff became relatively calm after Officer Newman held him against a wall. After a moment, however, he again became agitated and, after breaking free, ran back into his apartment. Officer Newman returned to his own apartment, where he discovered that his wife had called either the police or the fire department rescue squad.

Shortly thereafter, the rescue squad arrived to find plaintiff standing in the corridor. Being acquainted with

plaintiff, and not knowing why they had been called, the paramedics asked plaintiff what the problem was. After shouting that he wished to be left alone, plaintiff kicked open the door to his apartment and entered it. One of the paramedics started to follow plaintiff but withdrew after observing that plaintiff, who was dressed in a bathrobe, was holding a gun in his pocket. Another paramedic had approached Miss Guthrie, who was also in the hallway, and was told that two children were in plaintiff's apartment.

At that time, several Mundelein police officers arrived and plaintiff's superior officer, Sergeant Edward Sindles, pushed plaintiff's door open. Plaintiff, who was holding in his left arm one of his daughters by a former marriage, rushed to the door and slammed it shut. The door latch did not catch, and when Sergeant Sindles began to enter the apartment, plaintiff began screaming at him to leave. Sergeant Sindles testified that when he had fully entered the apartment, plaintiff, who was still holding his daughter, drew a handgun from his pocket and pointed it at Sergeant Sindles, shouting that he would kill Sindles if he did not leave. Repeating that he wanted to talk with plaintiff, Sergeant Sindles continued to advance into the apartment. Plaintiff's other daughter ran to plaintiff, who then pocketed the gun, picked her up in his right arm, and told Sergeant Sindles to take the gun from his pocket.

Other officers then entered the apartment and attempted to calm plaintiff down. Sergeant Sindles testified that plaintiff's behavior alternated between periods of relative calmness and irrationality, during which he was crying and screaming, and had to be physically restrained. At one point, plaintiff picked up his nightstick and hurled it at a sliding glass door, shattering the glass. The officers did not arrest plaintiff, but instead persuaded him to go to a hospital. When they were leaving

the apartment, plaintiff saw his ex-wife with his two children and again had to be restrained when he acted as if he was going to attack her. Plaintiff then became limp and, while lying on the corridor floor, began to scream obscenities. After being placed on a stretcher, plaintiff was taken to a hospital for treatment.

Plaintiff testified in his own behalf, stating that on the day of the incident he had argued with his ex-wife over the issue of custody and support of their two children and that he was left with a "dull feeling of hopelessness." Although he had not had any alcohol for two years prior to that day, plaintiff drank a beer at home following that argument. He then proceeded with his fiancee to several taverns, where they priced liquor for their wedding reception. While visiting the various taverns, plaintiff drank four more beers and had a meal. When asked what happened after they visited the Buck Two Tavern, plaintiff responded: "I recall nothing. I had a beer in there and I felt very strange and the next thing I can tell you about is bits and pieces. I can remember me crying and I can remember me waking up in the hospital. Outside of that I could not tell you what happened." Plaintiff also stated that he was being treated for bleeding ulcers at that time and had taken several prescribed medications, which he characterized as barbiturates. In addition, plaintiff testified that he first joined the police force in 1969, but that a work-related injury in 1972 caused him to undergo surgery to receive two artificial hip joints and to leave the department. In 1976, after receiving a release from his doctor, plaintiff renounced his disability pension and resumed his duties as a patrolman.

Randall Justus, one of the attending paramedics, testified that ingesting a combination of alcohol and barbiturates could have a synergistic effect which would differ from person to person, causing the ingredients to

produce a stronger reaction than would otherwise occur. Although Sergeant Sindles testified that he had smelled beer on plaintiff's breath and paramedic Justus tentatively agreed that plaintiff had been drinking, they, along with the other witnesses, were unable to state that plaintiff was intoxicated at the time of the incident.

On the basis of the foregoing evidence, the board found that plaintiff had violated its regulations because he was guilty of conduct unbecoming an officer, disorderly conduct, aggravated assault, unlawful use of a weapon, and directing coarse and profane language at fellow officers and citizens. In its order reversing the board, the circuit court found that there was no substantial evidence that plaintiff had either threatened Sergeant Sindles with his weapon or engaged in any "willful maltreatment of a person or willful insubordination or disrespect toward a superior officer." Our appellate court held that the circuit court had erred in finding that the board's decision was contrary to the manifest weight of the evidence. (108 Ill. App. 3d 8.) Nevertheless, because it considered plaintiff's misconduct to be "unrelated to the requirements of service" (108 Ill. App. 3d 8, 13), that court found that plaintiff's actions did not constitute cause for discharge.

When reviewing an administrative proceeding which resulted in a party's discharge, this court engages in a two-step analysis. (*Walsh v. Board of Fire & Police Commissioners* (1983), 96 Ill. 2d 101; *Department of Mental Health & Developmental Disabilities v. Civil Service Com.* (1981), 85 Ill. 2d 547, 550-51. See *Sutton v. Civil Service Com.* (1982), 91 Ill. 2d 404.) Initially, this analysis requires an inquiry into whether the administrative agency's findings of fact are contrary to the manifest weight of the evidence (see *Department of Mental Health & Developmental Disabilities v. Civil Service Com.* (1981), 85 Ill. 2d 547, 550; *Paglini v. Police Board*

(1975), 61 Ill. 2d 233, 239-40; *Basketfield v. Police Board* (1974), 56 Ill. 2d 351, 358), and those findings are accorded great weight. (See Ill. Rev. Stat. 1977, ch. 110, par. 274; *Department of Mental Health & Developmental Disabilities v. Civil Service Com.* (1981), 85 Ill. 2d 547, 550.) "This court, however, will not hesitate to grant relief when the record does not disclose evidentiary support for the agency's determination." (*Basketfield v. Police Board* (1974), 56 Ill. 2d 351, 359. See also *Kerr v. Police Board* (1974), 59 Ill. 2d 140, 146; *Harrison v. Civil Service Com.* (1953), 1 Ill. 2d 137, 154.) While the record does not contain a copy of the board's regulations, it is apparent that the circuit court considered the standard employed when evaluating conduct to be that of wilfullness, and that standard is not disputed here. Although plaintiff became lucid at times during the incident, the conduct for which he was discharged occurred during intervals which all of the witnesses agreed were characterized by irrational behavior; indeed, the police officers who responded to the incident considered plaintiff's demeanor so irrational that they did not arrest him but instead took him to the hospital. We agree with the circuit court that the record does not support a finding that plaintiff was guilty of wilful misconduct; accordingly, the board's determination was contrary to the manifest weight of the evidence.

Were it not for the unusual circumstances presented, we would consider the board's decision to fall within the scope of its discretion, for if an administrative agency's determination is not arbitrary or unreasonable, and does not involve the imposition of discipline unrelated to the needs of service, it will stand even if this court considers another sanction more appropriate. (*Sutton v. Civil Service Com.* (1982), 91 Ill. 2d 404, 411. See also *Department of Mental Health & Developmental Disabilities v. Civil Service Com.* (1981), 85 Ill. 2d 547, 552. Accord,

*DeGrazio v. Civil Service Com.* (1964), 31 Ill. 2d 482, 489.) As we recently noted:

> "A police officer hardly can commit a more serious offense than misuse of his gun. Nothing can undermine public confidence in the ability and good judgment of police officers more than the misuse of firearms. Common sense requires that each officer show considerable care and maturity in handling and using his service revolver, for he has ready access to this weapon every day of his career. An officer must never display his gun in a way that unnecessarily threatens other persons." (*Walsh v. Board of Fire & Police Commissioners* (1983), 96 Ill. 2d 101, 106.)

Accordingly, we cannot agree with our appellate court's determination that plaintiff's behavior and the type of discipline selected were unrelated to the needs of the police force or the village of Mundelein.

Plaintiff contends that the board's decision to discharge him was arbitrary and unreasonable because it was made without the benefit of more complete medical evidence which could have been obtained by the board under its authority to order medical and psychological examinations. The evidence presented to the board raised the strong possibility that plaintiff's irrational behavior stemmed from an inadvertently induced adverse reaction to his medication. A further indication of the board's awareness of potential psychological problems is apparent from the fact that it granted a continuance of approximately three weeks from the time the hearing was originally scheduled. This continuance was granted, at least in part, because plaintiff's attorney advised the board that plaintiff's doctor had stated that undergoing a hearing then would be detrimental to plaintiff's emotional health. In view of plaintiff's otherwise unblemished record, it was unreasonable for the board to discharge him without availing itself of the opportunity to examine in greater detail the medically related aspects of the basis for his discharge.

For the reasons stated, the judgment of the appellate court is reversed. In the circumstances presented here we must also vacate the circuit court's order reinstating plaintiff without requiring any further inquiry into his capacity to serve. We consider it more appropriate to remand the matter to the board so that it may, on the basis of further action not inconsistent with this opinion, determine a proper disposition. *Cf. Kreiser v. Police Board* (1977), 69 Ill. 2d 27, 31; *Basketfield v. Police Board* (1974), 56 Ill. 2d 351, 361.

*Appellate court reversed; circuit court vacated; cause remanded, with directions.*